**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

RONALD W. GIBSON, SR.,      )
           )
      Plaintiff,      )
           )
      v.      )      Civil Action No. 09-1227
           )      Judge Nora Barry Fischer
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,      )
           )
      Defendant.      )

## <u>MEMORANDUM OPINION</u>

### I.    Introduction

Plaintiff, Ronald W. Gibson, Sr., ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 1318-1383 (the "Act"). This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Nos. 8, 10). The record has been developed at the administrative level. For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and, therefore, is affirmed.

### II.    Procedural History

Plaintiff protectively filed his application for DIB and SSI on August 16, 2006, alleging disability since June 29, 2005 due to depression, a heart attack, a bipolar condition, and a herniated

disc. (Docket No. 5 at 11, 130-140).[1]   Plaintiff's claims were initially denied on February 26, 2007. (R. at 11, 106-18)  Thereafter, Plaintiff filed a timely written request for a hearing before an ALJ on March 26, 2007. (R. at 11, 119).  Plaintiff appeared and testified before the ALJ, with the assistance of legal counsel, on September 5, 2008.  (R. at 11, 22-65).  On November 18, 2008, the ALJ issued a decision denying Plaintiff's claims, concluding that Plaintiff was not disabled under the Act.  (R. at 8-21).  Plaintiff filed a timely request for review on December 19, 2008, and the Appeals Council subsequently denied Plaintiff's request on July 23, 2009, thereby making the ALJ's decision the final decision of the Commissioner.  (R. at 1-3).

Having exhausted all administrative remedies, Plaintiff filed this action on September 10, 2009.  (Docket No. 3).  The Commissioner filed its Answer on November 13, 2009.  (Docket No. 4).  After both parties were granted extensions of time (Docket Nos. 8, 13), Plaintiff filed his Motion for Summary Judgment and Brief in Support on December 17, 2009 (Docket Nos. 9 and 10), and the Commissioner filed its Motion for Summary Judgment and Brief in Support on February 8, 2010. (Docket Nos. 14 and 15).

## III.   Standard of Review

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[2] and 1383(c)(3)[3]. Section 405(g) permits a district court to review

---

[1]      Hereinafter, all citations to certified record filed at Docket Nos. 5-1 to 5-9 will be of the form "(R. at _ )."

[2]      Section 405(g) provides in pertinent part:
         Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

transcripts and records upon which a determination of the Commissioner is based. Because the standards for eligibility under Title II (42 U.S.C. §§ 401-433, regarding DIB), and judicial review thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381-1383f, regarding SSI), regulations and decisions rendered under the Title II disability standard, 42 U.S.C. § 423, are pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a). *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3(1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n. 1 (3d Cir. 2002).

When reviewing a decision denying DIB and SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns,* 312 F.3d at 118. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)(quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

---

42 U.S.C. § 405(g).

3

       Section 1383(c)(3) provides in pertinent part:
           The final determination of the Commissioner of Social Security after a hearing
           under paragraph (1) shall be subject to judicial review as provided in section 405(g)
           of this title to the same extent as the Commissioner's final determinations under
           section 405 of this title.

42 U.S.C. § 1383(c)(3).

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).

The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given plaintiffs's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## IV.   Factual Background

### A.  General Background

Plaintiff was born on August 17, 1967, making him 37 years old as of the onset date of his alleged disability on June 29, 2005. (R. at 106). Plaintiff did not graduate from high school, but

obtained a GED.  (R. at 26).  As of April 22, 2008, he weighed 134 pounds.  (R. at 410).  Plaintiff

has seven adult children from two previous relationships.  (R. at 366).  Plaintiff has been married to

his current wife for approximately two years.  (R. at 49).  They do not have any children together.

(R. at 48-49)  Plaintiff's mother-in-law resides with he and his wife.  (R. at 49).  Since June 29,

2005, Plaintiff has worked as a temporary laborer at a mushroom mine, [4] part-time as a cook,[5] and

for a glass bottling company packing glass.[6]  (R. at 27-31).

### B.   Medical Background

#### 1.   *Cervical and Lumbar Spine*

On May 11, 2006, Dr. Edward Balestrino, D.O., a board certified family practitioner and

Plaintiff's primary care physician, reported that Plaintiff had previously been in the emergency room

at Clarion Hospital after attempting to break his neck by jumping from a filing cabinet while

incarcerated.[7]  (R. at 365, 482).  A computed tomography ("CT")[8] of Plaintiff's head and neck did

not indicate any neck injury.  (R. at 482).  Dr. Balestrino reported that Plaintiff had a "full range of

---

[4]

      Plaintiff obtained this job through a temporary staffing agency, and stated that it only  lasted "a couple months"
in 2007.  (R. at 29).

[5]

      This job began in January 2008, and ended in April or May 2008, as stated by Plaintiff.  (R. at 28). However,
as later noted by the ALJ, records demonstrate that Plaintiff was still working as a cook through July 2008 and perhaps
later. (R. at 13).

[6]

      Plaintiff testified that he lost this job because of his temper. (R. at 30).

[7]

      This event occurred in 2005 while he was incarcerated.  (R. at 39).  Plaintiff claimed that he had been
incarcerated at some point in every year since 1987.  (R. at 45).

[8]

      Computed tomography ("CT") is a medical imaging method that combines a series of X-ray views taken from
many different angles to produce cross-sectional images of the bones and soft tissues inside the body. *See*
http://mayoclinic.com/health/ct-scan/MY00309U (last visited March 26, 2010).

motion" in his neck.  (*Id.*).  However, eight days later during a visit, on May 19, 2006, Plaintiff

began to complain of neck pain.  (R. at 481).  Dr. Balestrino reported that Plaintiff had "left sided

pain at about [the] C6 to T1 region with radiation into the left arm," and that Plaintiff's range of

motion was "diminished in all planes."  (*Id.*).

An MRI of Plaintiff's cervical spine on June 22, 2006 revealed left lateral disc protrusion at

C5-6 with left neural foraminal narrowing.  (R. at 315, 468, 478-79).  Dr. Ramachandra Tata, M.D.,

a neurologist, performed an examination of Plaintiff on July 14, 2006, which showed cervical

radiculopathy and a normal gait.[9]  (R. at 468).  On August 24, 2006, Dr. Balestrino examined

Plaintiff and reported cervical radiculopathy with a known cervical herniated disc.  (R. at 439).  Dr.

Balestrino then wrote to Dr. Tata in regard to Plaintiff, stating that "the majority of his symptoms

are related to his herniated cervical disc." (R. 473-74).

On examination at Butler Memorial Hospital on September 25, 2006, Plaintiff was assessed

to have cervical spine stenosis, despite having a normal gait and a full range of motion in his spine.

(R. at 312-14).  Dr. David Evanko, M.D., a family practitioner, examined Plaintiff on October 31,

2006, and reported a mild posterior cervical muscle spasm in Plaintiff's paravertebral region.  (R.

at 282-85).  However, Dr. Evanko also reported that Plaintiff could walk normally, and that he had

a normal range of motion in his neck.  (R. at 284).

---

[9]

      A gait can refer to a particular way or manner of moving on foot: walking and running are the two basic human gaits. *See* http://www.websters-online-dictionary.org/definition/gait (last visited March 26, 2010)

A magnetic resonance imaging ("MRI")[10] exam of Plaintiff's spine on November 1, 2006 revealed "[m]ild central disc bulges at L4-5 and L5-S1, which impress on the anterior thecal sac but do not cause significant stenosis." (R. at 302). On January 11, 2007, Dr. Sophie Hanna, M.D., a specialist in physical medicine and rehabilitation, administered a cervical interlaminal epidural steroid injection due to Plaintiff's complaints of neck pain. (R. at 300-01). During a follow-up exam on January 24, 2007, Plaintiff indicated to Dr. Balestrino that the initial epidural steroid helped, but that it did not last more than a couple of days. (R. at 433). Dr. Balestrino noted that Plaintiff looked uncomfortable at the time of the exam. (*Id.*).

After examining Plaintiff again on April 23, 2007, Dr. Balestrino reported that although Plaintiff continued to have neck pain, a recent electromyography ("EMG")[11] revealed that a herniated cervical disc was not the cause of the radiculopathy in his arm. (R. at 430). On August 1, 2007, Plaintiff looked well despite a restricted range of motion in his neck. (R. at 424). Dr. Balestrino performed a back exam of Plaintiff on September 19, 2007, which indicated "some mild paraspinal muscle fullness on the T spine from about T5 to T10 and nontender." (R. at 420). Dr. Balestrino further noted that Dr. Ferraro,[12] a neurosurgeon who had previously examined Plaintiff, believed that Plaintiff did not require surgery. (R. at 420, 464). Dr. Balestrino saw Plaintiff again on January 30, 2008, and reported that Plaintiff "did not look terribly ill," despite having diminished range of

---

[10]     Magnetic resonance imaging (MRI) is a technique that uses a magnetic field and radio waves to create detailed images of the organs and tissues within the body. *See* http://mayoclinic.com/health/mri/MY00227 (last visited March 26, 2010).

[11]     Electromyography (EMG) is a diagnostic test used to evaluate the electrical activity in the nerves as they translate messages to the muscles. *See* http://mayoclinic.com/health/emg/MY00107 (last visited March 26, 2010).

[12]     The "Dr. Ferraro" referred to by Dr. Balestrino is seemingly Dr. Francis T. Ferraro of Pittsburgh, PA. *See* http://www.theneurosurgerygroup.com/asp/ferraro.aspx (last visited March 26, 2010).

motion in all planes of his neck.  (R. at 415).

On examination by Dr. Tata on April 18, 2008, Plaintiff exhibited a steady gait and no carotid or cranial bruises in his neck.  (R. at 464).  However, Dr. Tata remarked that Plaintiff's previous MRI revealed a "herniated disc at C5-C6," however, Dr. Hanna's impression from that MRI did not indicate a herniated disc.  (R. at 302, 464).  During a neurological follow-up visit with Dr. Tata on June 20, 2008, Plaintiff complained of gait difficulty and neck pain.  (R. at 463).  Dr. Tata reported that Plaintiff had slightly diminished motor strength (four over five) and a steady gait.  (*Id.*).

2.   *Multiple Sclerosis*

An MRI of Plaintiff's brain on May 13, 2006 revealed "diffuse abnormal white matter signal [sic] hyperintensity on the FLAIR sequences."[13]  (R. at 478-79).  After reviewing the results of the MRI and examining Plaintiff on June 16, 2006 and July 14, 2006, Dr. Tata concluded that Plaintiff's diffuse white matter lesions were "<u>suggestive</u> of a demyelinating disease like multiple sclerosis" ("MS").[14]  (R. at 468-69)(emphasis added).  Dr. Tata recommended a spinal tap for July 17, 2006, but Plaintiff decided not to go forward with the procedure.[15]  (R. at 51-52, 468).  On August 24, 2006, Dr. Balestrino examined Plaintiff, and wrote to Dr. Tata in order to inform him, among other things, that Plaintiff did <u>not</u> seem to be symptomatic of MS, and that the majority of his symptoms

---

[13]   Fluid-attenuated inversion recovery ("FLAIR") is an advanced magnetic resonance imaging sequence that reveals tissue T2 prolongation with cerebrospinal fluid suppression, allowing detection of superficial brain lesions. FLAIR can detect many cortical and juxtacortical lesions in MS. *See* http://www.ncbi.nlm.nih.gov/pubmed/11346369 (last visited March 26, 2010)

[14]   Multiple sclerosis ("MS") is a potentially debilitating disease in which the body's immune system eats away at the protective sheath that covers the nerves.  Ultimately, this may result in deterioration of the nerves themselves, a process that is not reversible. *See* http://mayoclinic.com/health/multiple-sclerosis/DS00188 (last visited March 26, 2010).

[15]   Plaintiff refused to undergo the spinal tap procedure because he believed that the physician was going to puncture the wrong region of his spine, and that it would cause severe discomfort.  (R. 51-52).

8

were related to his spinal injury.  (R. at 473-74).

A second MRI of Plaintiff's brain was performed on January 18, 2008.  (R. at 487).  The bilateral white matter plagues were again innumerable, but no new plagues were detected. (*Id.*).  In comparison to the first MRI of May 13, 2006, there was no evidence of MS plaques involving the optic nerves or optic neuritis.  (*Id.*).  Plaintiff was diagnosed as having "stable" MS.  (R. at 487). Michael Neiswonger, C.R.N.P., a nurse practitioner in Dr. Balestrino's office, reported on February 26, 2008 that Plaintiff's "numbness in his hand may be secondary to MS."  (R. at 414).  On April 18, 2008, Dr. Tata examined Plaintiff for the first time since July 2006.  (R. at 464).  Dr. Tata noted that Plaintiff's second MRI of January 18, 2008 showed "diffuse white matter lesions <u>suggestive</u> of a demyelinating disease."[16]  (R. at 464)(emphasis added).

Plaintiff saw Dr. Balestrino for a follow-up examination on May 2, 2008.  (R. at 409). Plaintiff complained of frequent visual disturbance and numbness in his fingers and legs.  (*Id.*). Dr. Balestrino reported that "some of his symptoms are related to MS," but that other symptoms improved with the use of steroids.  (*Id.*).  During the hearing before the ALJ on September 5, 2008, Plaintiff testified that the symptoms he was having from his possible MS included loss of balance and constant numbness in his arms and legs.  (R. at 35-36).

### 3.    *Carpal Tunnel Syndrome*

Dr. Balestrino examined Plaintiff on September 11, 2006, and reported that Plaintiff's "grip strength and wrist strength is slightly diminished."  (R. at 437).  On a questionnaire completed four days later, Plaintiff indicated that he could dial a regular touch tone telephone, use a standard size

---

16

"Demyelination" is defined as the loss of myelin with preservation of the axons or fiber tracts. STEDMAN'S MEDICAL DICTIONARY 509  (28th Ed. 2006).  Central demyelination occurs within the central nervous system (e.g., the demyelination seen with multiple sclerosis). *Id.*

TV remote control, use a fork and knife, tie his shoes, and fasten buttons on clothing.  (R. at 189).

Plaintiff also noted that although he was technically able to do these activities, his hands sometimes

went numb.  (*Id.*).  Plaintiff's Physical Residual Functional Capacity Assessment, conducted on

December 28, 2006, indicated that he could occasionally lift 50 pounds and frequently lift 25 pounds.

(R. at 379-80).  Michael Neiswonger reported on February 26, 2008 that an EMG showed Plaintiff

to have "mild carpal tunnel and mild nerve impingement, but nothing specific."  (R. at 414).

Plaintiff testified before the ALJ that his carpal tunnel caused him to work slower at the mushroom

mines and drop things while working as a cook.  (R. at 47-48).

### 4.    *Depression and Alcoholism*

Dr. Balestrino treated Plaintiff for depression on March 10, 2004.  (R. at 281).  Plaintiff was

previously on Lexapro,[17] but stopped taking it when he decided to drink heavily for a week in 2004.

(*Id.*). Dr. Balestrino advised Plaintiff to continue with Lexapro.  (*Id.*).  He also diagnosed Plaintiff

with alcoholism at that time.  (*Id.*).  Butler County Prison records from August and September of

2004 indicate that Plaintiff was taking Lexapro, Lithium,[18] and Trazodone[19] for his depression.  (R.

---

[17]    Lexapro is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs).  It affects chemicals in the brain that may become unbalanced and cause depression or anxiety.  Lexapro is used to treat anxiety in adults and major depressive disorder in adults and adolescents who are at least 12 years old.  *See* http://www.drugs.com/lexapro.html (last visited March 26, 2010).

[18]    Lithium affects the flow of sodium through nerve and muscle cells in the body.  Sodium affects excitation or mania.  Lithium is used to treat the manic episodes of manic depression.  Manic symptoms include hyperactivity, rushed speech, poor judgment, reduced need for sleep, aggression and anger.  It also helps to prevent or lessen the intensity of manic episodes. *See* http://www.drugs.com/lithium.html (last visited March 26, 2010).

[19]    Trazodone is a antidepressant medication.  It is thought to increase the activity of one of the brain chemicals (serotonin) which may become unbalanced and cause depression. *See* http://www.drugs.com/trazodone.html (last visited March 26, 2010).

at 254-56).

Dr. Balestrino saw Plaintiff on September 30, 2005, and restarted him on Lexapro for depression.  (R. at 280).  Plaintiff indicated that he had cut back his drinking, but that he would sometimes still have up to 12 drinks per day.  (*Id.*).  Butler County Prison records from January 13, 2006 indicate that Plaintiff was given a prescription for Celexa[20] to help with his depression.  (R. at 239).  Mr. Neiswonger treated Plaintiff on February 28, 2006.  (R. at 279).  Plaintiff stated that he had been sober since November 2005.  (*Id.*).  Mr. Neiswonger increased Plaintiff's Lexapro prescription to 20 milligrams daily.  (*Id.*).

Dr. Evanko examined Plaintiff on November 1, 2006.  (R. at 282-85).  Dr. Evanko noted that Plaintiff had previously been diagnosed with depression and bipolar disorder.  (*Id.*).  Plaintiff's medications at that time included baclofen,[21] Ultram,[22] ibuprofen,[23] and Darvocet.[24]  (R. at 282).

Dr. T. David Newman, Ph.D., performed a clinical psychological disability examination of

---

[20]

 Celexa is an antidepressant included within a group of drugs called selective serotonin reuptake inhibitors (SSRIs). It works by restoring the balance of serotonin, a natural occurring substance found in the brain, which helps to improve certain mood problems. *See* http://www.drugs.com/celexa.html (last visited March 26, 2010).

[21]

 Baclofen is a muscle relaxer and an antispastic agent used to treat muscle symptoms caused by multiple sclerosis, including spasm, pain, and stiffness. *See* http://www.drugs.com/baclofen.html (last visited March 26, 2010).

[22]

 Ultram (tramadol) is a narcotic-like pain reliever used to treat moderate to severe pain.  *See* http://www.drugs.com/ultram.html (last visited March 26, 2010).

[23]

 Ibuprofen is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs).  It works by reducing hormones that cause inflammation and pain in the body. *See* http://www.drugs.com/ibuprofen.html (last visited March 26, 2010).

[24]

 Darvocet contains a combination of propoxyphene and acetaminophen.  Propoxyphene is in a group of drugs called narcotic pain relievers.  Acetaminophen is a less potent pain reliever and fever reducer that increases the effects of propoxyphene. *See* http://www.drugs.com/darvocet.html (last visited March 26, 2010).

Plaintiff on January 24, 2007. (R. at 365-71). Dr. Newman's Axis 1 diagnoses were major depressive disorder and alcohol dependence (sustained early remission, one month). (R. at 367). He stated that if Plaintiff is sober, he does not have a substantial problem understanding and retaining instructions to perform simple, repetitive tasks and maintaining concentration and pace for the same purposes. (*Id.*). Dr. Newman opined that "sobriety would be paramount" and recommended a psychiatric evaluation of his medications and oversight of eventual psychiatric prescriptions with attendance at individual psychotherapy sessions. (R. at 367).

Dr. Ray M. Milke,[25] a state agency psychological consultant, performed a psychiatric review of Plaintiff's records in order to assess Plaintiff's residual functional capacity. (R. at 388-89). Dr. Milke stated that although Plaintiff was incapable of understanding and remembering complex or detailed instructions, this did not restrict his ability to function in a work setting. (R. at 388). Plaintiff was found to be capable of working at a consistent pace, making simple decisions, carrying out very short and simple instructions, and maintaining concentration for extended periods of time. (*Id.*). Thus, Dr. Milke found Plaintiff able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments. (R. at 389).

Dr. Harshad Patel,[26] a psychiatrist, treated Plaintiff on March 27, 2007, April 17, 2007, May

---

[25]
      Ray M. Milke has a Ph.D., and practices psychology in Irwin, Pennsylvania. (R. at 389).

[26]
      Harshad Patel provides child, adolescent, and adult psychiatry services for Primary Health Network ("PHN"). He earned his medical degree from MS University in Baroda, India, and completed his residency in psychiatry at Hahnemann University Hospital in Philadelphia, Pennsylvania.

15, 2007, and August 21, 2007, and prescribed Zoloft,[27] Wellbutrin,[28] and Remeron[29] for Plaintiff's major depressive disorder.  (R. at 404-08).  At that time, Plaintiff denied any suicidal ideation.[30]  (R. at 406).  Plaintiff told Dr. Balestrino on September 19, 2007 that he was no longer depressed since working in the mushroom mines. (R. at 420).

On August 4, 2008, Plaintiff was admitted to the emergency room of Butler Memorial Hospital following on overdose of Tegretol.[31]  (R. at 449-52).  Plaintiff indicated that the drug overdose and suicidal incident were "completely due" to a binge alcohol intake the previous day. (R. at 449).  Plaintiff was treated and discharged after several days in the hospital.  (R. at 449-51). Plaintiff testified before the ALJ on September 5, 2008 that he had not had any alcohol since he was released from the hospital in August 2008.  (R. at 43).

  5.  *Hearing Loss*

Plaintiff is deaf in his right ear due to past right mastoid surgery.  (R. at 283, 469).  An

---

[27]

   Zoloft is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs).  Zoloft affects chemicals in the brain that may become unbalanced and cause depression, panic, anxiety, or obsessive-compulsive symptoms. *See* http://www.drugs.com/zoloft.html (last visited March 26, 2010).

[28]

   Wellbutrin is an antidepressant medication.  It works in the brain to treat depression.  Wellbutrin is used to treat major depressive disorder. *See* http://www.drugs.com/wellbutrin.html (last visited March 26, 2010).

[29]

   Remeron is a tetracyclic antidepressant.  It affects chemicals in the brain that may become unbalanced and cause depression.  It is thought to increase the activity of norepinephrine and serotonin which help elevate mood.  *See* http://www.drugs.com/remeron.html (last visited March 26, 2010).

[30]

   Plaintiff has a history of suicide attempts including cutting his wrists in 1989, overdosing on Darvocet and beer in 2004, and jumping off of a cabinet while trying to break his neck in 2005.  (R. at 365).

[31]

   Tegretol is in a group of drugs called anticonvulsants.  It works by decreasing nerve impulses that cause seizures and pain.  Tegretol is used to treat certain types of seizures associated with epilepsy, the treatment of the nerve pain associated with true trigeminal neuralgia and diabetic neuropathy.  It is also used to treat bipolar disorder.  *See* http://www.drugs.com/tegretol.html (last visited March 26, 2010).

audiogram[32] performed on November 1, 2006 showed absolutely no hearing in the right ear and normal hearing in the left ear at all frequencies.  (R. at 283).  Plaintiff did not allege disability due to a lack of hearing when he originally filed for benefits.  (R. at 11).

### C.   Administrative Hearing

Plaintiff, represented by legal counsel, appeared and testified at an administrative hearing on September 5, 2008.  (R. at 22-65).  Plaintiff testified that he became disabled in June 2005, when he was in jail.  (R. at 39).  Since June 2005, as noted above, he obtained temporary employment as a laborer in a mushroom mine, as a packer in a bottling facility, and as a cook in a bar.  (R. at 27-30).  When asked about his job in the mushroom mine, Plaintiff testified that it lasted "a couple months," and ended because of back pain.  (R. at 29).  Plaintiff described the job as requiring a lot of bending, but not much lifting.  (R. at 30).  George J. Starosta,[33] the vocational expert ("VE"), deemed the work to be "light exertional."  (*Id.*).  When asked about his job as a cook, Plaintiff testified that he worked 20 hours a week "for a few months," and that he stopped working due to a balance problem and dropping things which he attributed to his MS and his depression medication.  (R. at 27-28).  When asked about what he currently does all day, Plaintiff indicated that he watches TV and sits around, and that he relies on his wife for many things.  (R. at 49-51). However, he can cook himself a meal. (R. at 50).

---

[32]

     An audiogram is a test of hearing at a range of sound frequencies. *See* http://www.medterms.com/script/main/art.asp?articlekey=2392 (last visited March 26, 2010).

[33]

     Mr. Starosta is the President of Star Leadership Development, Inc.  (R. at 128). He is also a consultant for Star Placement. (*Id.*).  Mr. Starosta received a Bachelor of Science from King's College in 1975, and a Masters of Health Administration from Georgia State University in 1979.  (R. 128-29).

Plaintiff testified that "two crushed discs" in his neck, in addition to his MS and depression, were the source of his limitations. (R. at 32). When asked how his back problems limit him, Plaintiff responded that he could "barely move." (R. at 38). Plaintiff testified that his back bothered him while he worked in the mushroom mine because he often had to bend at the waist and get down on his knees. (R. at 39). Although Plaintiff's work in the mushroom mine did not require lifting, he estimated that he could have lifted up to 10 pounds without experiencing pain. (R. at 40).

When questioned about his MS, Plaintiff stated that his symptoms included loss of balance and numbness in his arms and legs. (R. at 35). The numbness had worsened in the six months prior to the hearing. (*Id.*). When asked about the same, Plaintiff stated, "[m]y legs give out. I have no strength in my arms." (R. at 36). Plaintiff further indicated that these symptoms were not as severe when he was working 20 hours a week as a cook from January to April or May 2008. (R. at 37). Plaintiff stated that six months prior to the hearing he could walk for about 10 minutes before taking a break, and that at the time of the hearing he could walk a "couple minutes" before taking a break. (R. at 40-41). Although Plaintiff indicated that his back feels better when he walks, the numbness in his legs prevents him from walking for an extended period of time. (R. at 41-42).

When questioned about his carpal tunnel syndrome, Plaintiff indicated that his right hand was worse than his left, and that he was right handed. (R. at 47). Plaintiff testified that he could button his shirt and tie his shoes. (*Id.*). Plaintiff further testified that carpal tunnel caused him to work slower in the mushroom mine and caused him to drop things while working as a cook. (R. at 47-48). Regarding his depression, Plaintiff indicated that he had been on medication for about

a year.  (R. at 42-43).  Plaintiff stated that he attempted suicide a couple of weeks prior to the hearing by taking a "bunch of pills" and drinking.  (R. at 43).  Plaintiff testified that he was an alcoholic, but that he had not had anything to drink since his most recent suicide attempt.  (*Id.*). He did not usually drink more than a "six pack a week" immediately prior to his suicide attempt, but he used to drink every day.  (R. at 43-44, 55).  When questioned about his hearing loss, Plaintiff indicated that he was deaf in his right ear.  (R. at 45).

Mr. Starosta, the VE, evaluated Plaintiff's testimony.  (R. at 59).  When questioned about what light, unskilled, sedentary jobs existed in the national economy for a hypothetical individual of Plaintiff's age, education, and work history that did not involve operation of foot controls, balancing, working around hazards, repetitive grasping, fingering, or handling, the VE replied pointing out available jobs such as a surveillance system monitor, call out operator, and telephone quotation clerk.  (R. at 59-62).

## V.      Discussion

The ALJ determined that Plaintiff was not disabled as defined by the Social Security Act from June 29, 2005 through the date of the decision.  (R. at 11).  The ALJ reached this decision after applying the five step framework for analysis summarized in *Barnhart v. Thomas*, 540 U.S. at 24-25.

### A.      The Five Step Analysis

Under the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity[34] since June 29, 2005, the alleged onset date of his disability (R. at 13). However,

---

[34]      Substantial gainful activity is defined as work activity that is both substantial and gainful. 20 C.F.R. §§ 404.1520(b) and 416.920(b). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. §§ 404.1572(a) and 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. §§ 404.1572(b) and 416.972(b).

the ALJ pointed out Plaintiff's testimony and the record which reflect that Plaintiff worked part-time since that date; specifically, in 2007 he worked in the mushroom mines, and between January 2008 and through at least July 2008, as a cook. (R. at 13, 47-48, 420). Although neither of these jobs rose to the level of substantial gainful activity under the Regulations, Plaintiff's ability to do these jobs, in the ALJ's opinion, reflected poorly on his credibility and the validity of his subjective complaints. (*Id.*).

At step two, the ALJ found that Plaintiff has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, carpal tunnel syndrome, hearing loss, multiple sclerosis, a mood disorder, and a history of alcoholism. (R. at 13). In the third step, the ALJ concluded that none of Plaintiff's medical impairments met or medically equaled any impairment listed in 20 C.F.R. Pt. Subpt. 4, App. 1 (the "Listing of Impairments"). (R. at 14). In regard to Plaintiff's cervical and lumbar spine problems, the ALJ held that "the record does not show that they fulfill the requirements contained in Listing 1.02, Major Dysfunction of a Joint(s), (due to any cause) or Listing 1.04, Disorders of the Spine, in Appendix 1." (*Id.*). In regard to Plaintiff's MS, the ALJ held that "there is no indication that [Plaintiff] has severe complications from this disorder, and certainly does not have the requisite findings contained in listing 11.09,[35] Multiple Sclerosis." (*Id.*).

Next, the ALJ determined that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b)[36] and 416.967(b), despite only being able to

---

[35]

[36]     *See* note 37, *infra.*

         "Light work" is defined as:
              [I]nvolv[ing] lifting no more than 20 pounds at a time with frequent lifting or
              carrying of objects weighing up to 10 pounds. Even though the weight lifted may
              be very little, a job is in this category when it requires a good deal of walking or

17

"occasionally climb (ramp/stairs only), balance, stoop, crouch, crawl, and kneel," and having no ability to work in loud environments, operate foot controls, or perform repetitive grasping. (R. at 16). The ALJ further found that Plaintiff's medically determinable impairments could reasonably be expected to produce his alleged symptoms, but that Plaintiff's statements concerning the intensity, duration, and limiting effects of these symptoms were not entirely credible. (R. at 19). In addition, after review of Plaintiff's medical records, in particular those of his treating physician, Dr. Balestrino, and his work history, the ALJ did not afford much weight to Dr. Balestrino's opinion. (R. at 19).

Finally, under step five, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could have performed. (R. at 20). Specifically, based on the VE's testimony, the ALJ found that Plaintiff could work as a gate guard, an usher, a surveillance system monitor, a call-out operator, and a telephone information clerk. (*Id.*). Accordingly, the ALJ found that Plaintiff was not disabled from June 29, 2005 through the date of his decision, November 18, 2008. (R. at 20-21).

B.      Issues Before This Court

Plaintiff has set forth several arguments suggesting that the ALJ erred in his reasoning. First, Plaintiff argues that the ALJ erred in determining that Plaintiff's impairments did not meet or medically equal the impairment of MS in the Listings of Impairments. (Docket No. 10 at 5-6). Second, Plaintiff argues that the ALJ's residual functional capacity finding at step five was

---

standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567(b) and 416.967(b).

improperly based on factually incorrect statements. (*Id.* at 9-13). Third, Plaintiff argues that the ALJ improperly evaluated and discredited his subjective complaints of pain and other non-exertional limitations. (*Id.* at 13-14). Fourth and finally, Plaintiff contends that the ALJ erred in disregarding the opinions of his treating physician, Dr. Balestrino, and the VE. (*Id.* at 14-15). To the contrary, the Commissioner argues that the ALJ's determination was supported by substantial evidence and the decision should be affirmed. (Docket No. 15).

###   C.   Determination of Plaintiff's MS under Listing 11.09

Plaintiff contends that the ALJ failed to analyze "any of the medical records" in determining whether Plaintiff's MS meets or equals the listing for MS as defined in Listing 11.09.[37] (*Id.* at 6). Therefore, he argues that the ALJ erred at step three by ignoring and failing to discuss the medical records. (*Id.* at 7-8).

"For a claimant to show his impairment matches a listing, it must meet *all* of the specific medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Jones v. Barnhart*, 364 F.3d 501, 504 (3d Cir. 2004)(quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)(emphasis in original)); *see also Knox v. Comm'r of Soc. Sec.*, Civ. A. No. 09-1358, 2010 U.S. App. LEXIS 2848 (3d Cir. Feb. 12, 2010)(citing same).

---

[37]   Listing 11.09 for multiple sclerosis defines the condition as follows:
   A. Disorganization of motor function as described in 11.04B; or
   B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or
   C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

Listing of Impairments - Adult Listings (Part A), 11.00 Neurological; available at: http://www.ssa.gov/disability/professionals/bluebook/11.00-Neurological-Adult.htm#11.09%20Multiple%20sclerosis (last visited March 29, 2010).

The claimant bears the burden of showing that he satisfies the criteria for a listed impairment. *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).[38]

At step three, an ALJ's "bare conclusory statement[s]" for a decision that an impairment does not match or is not equivalent to a listed impairment are insufficient. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000). However, *Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Instead, the function of *Burnett* is "to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *See id.* at 120.

In this case, the ALJ's decision, read as a whole, demonstrates that the ALJ considered the appropriate factors in reaching the conclusion that Plaintiff's impairment did not meet the requirements for the listing of MS. *See Jones*, 364 F.3d at 505 (discussing the same). The ALJ devoted over three pages of his opinion to a discussion of the medical evidence. (R. at 16-19). At step three, the ALJ specifically noted that the results from Plaintiff's MRI exams, although consistent with abnormalities in the white matter of the brain, were only suggestive of MS. (R. at 13, 18). Based on the ALJ's review of Plaintiff's medical history, he found no indication that

---

[38]

> The Code of Federal Regulations explains as follows how medical evidence is evaluated at step three:
> We will decide that your impairment(s) is medically equivalent to a listed impairment in appendix 1 if the medical findings are at least equal in severity and duration to the listed findings. We will compare the symptoms, signs, and laboratory findings about your impairments(s), as shown in the medical evidence we have about your claim, with the medical criteria shown with the listed impairment. If your impairment is not listed, we will consider the listed impairment most like your impairment to decide whether your impairment is medically equal. If you have more than one impairment, and none of them meets or equals a listed impairment, we will review the symptoms, signs, and laboratory findings about your impairment to determine whether the combination of your impairments is medically equal to any listed impairment.

20 C.F.R. § 404.1526 (2001).

Plaintiff has severe complications from this disorder, and therefore, did not have the requisite symptoms under Listing 11.09. (*Id.*). In particular, the ALJ noted that Dr. Balestrino's report in May 2008 that Plaintiff's condition was stable and that in July 2008 no objective findings were reported regarding the same.(R. at 18). He further noted that Plaintiff was working at that time. (*Id.*).

Consequently, the Court finds that the ALJ's discussion of the medical record in relation to his finding at step three satisfies *Burnett*'s requirement that there be sufficient explanation to provide meaningful review. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009)(the ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusions).

### D.    Residual Functional Capacity Assessment

Plaintiff also contends that the ALJ erred at step four in determining Plaintiff's residual functional capacity due to erroneous factual findings. (Docket No. 10 at 10). Plaintiff relies heavily on the fact that the ALJ incorrectly noted that he was deaf in his left ear, while the record demonstrates that he is deaf in his right ear. (*Id.*).  He also argues that the ALJ erred in finding that Dr. Balestrino noted that Plaintiff required only conservative medical management, as the ALJ referred to a report from Dr. Tata to support the same. (*Id.*).  Plaintiff contends that contrary to the ALJ's finding, the record shows that he has significant sensory and motor loss with abnormal reflexes. (*Id.* at 11).  Additionally, Plaintiff argues that in considering his functional limitations, the ALJ failed to recognize that Plaintiff left his position in the mushroom mines and as a cook because of his physical limitations, nor is there a treating physician's opinion in the record that Plaintiff could perform the requirements of light work. (*Id.*). Due to Plaintiff's

physical impairments in his upper extremities, he maintains that he is unable to perform the lifting requirements of light work. (*Id.* at 12-13). Therefore, Plaintiff argues that the ALJ's conclusion that he is able to perform light work is not supported by substantial evidence.

"'Residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'"  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)).  A claimant's RFC represents the most, not the least, that a person can do despite his or her limitations.  *See Cooper v. Barnhart*, Civ. A. No. 06-2370, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)).  In determining a person's RFC, an administrative law judge must consider all evidence of record and the claimant's subjective complaints and statements concerning his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a), and 416.920. Although an administrative law judge can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so.  *Id.*   As the Court of Appeals held in *Burnett*, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"  *Id.* at 121 (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

Here the ALJ's RFC determination is as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). However, the claimant can only occasionally climb (ramps/stairs only), balance, stoop, crouch, crawl, and kneel; and cannot work in environments with loud background noises because of right ear deafness; cannot operate foot controls, balance, or be exposed to hazards such as

unprotected heights and moving machinery; cannot do any commercial driving; cannot perform repetitive grasping, fingering, or handling, and is limited to simple, routine, repetitive tasks, not performed in a fast paced production environment, involving only simple, work-related decisions, and in general, relatively few workplace changes.

(R. at 16).

In the RFC finding, the ALJ does mistakenly state that the 2006 hearing test showed Plaintiff was deaf on his left side, when the records from that exam actually state that he is deaf on the right side. (R. at 17, 283). However, this has no bearing on the RFC determination, as the ALJ correctly stated that Plaintiff was deaf in his right ear, and further notes that Plaintiff never complained to any of his physicians about difficulties with hearing loss, nor did he claim that he was disabled on account of the same. (R. at 16-17, 283). Nevertheless, the ALJ restricted Plaintiff from working in environments with loud background noises. (R. at 16).

The Court also finds that Plaintiff's contention that he required more than conservative medical treatment[39] is not supported by the record. As noted by the ALJ, the medical records do not demonstrate that Plaintiff required surgery, other invasive procedures, frequent hospitalizations, or radical[40] therapeutic care. (R. at 17, 19, 420, 464, 409). Nor did Plaintiff require strong narcotic medication for pain control. (*Id.*). As to his carpal tunnel syndrome, in February 2008, Plaintiff had "mild carpal tunnel and mild nerve impingement, but nothing

---

[39]    "Conservative treatment" is defined as treatment that is designed to avoid radical medical therapeutic measures or operative procedures. *See* http://medical-dictionary.thefreedictionary.com/conservative+treatment; (last visited March 26, 2010); *see also* STEDMAN'S MEDICAL DICTIONARY 433 (28th Ed. 2006)("conservative," denoting treatment by gradual, limited, or well-established procedures, as opposed to radical.).

[40]    "Radical" treatment is defined as treatment by extreme, drastic, or innovative, as opposed to conservative, measures. STEDMAN'S MEDICAL DICTIONARY 1621 (28th Ed. 2006).

specific." (R. at 414).   During this time, he continued to work as a cook, although with some limitations, as he occasionally dropped things. (R. at 47-48).   Moreover, after his extensive review of the medical record, the ALJ fully accommodated any hand problems Plaintiff may have had by limiting him to work that did not require repetitive grasping, fingering, or handling. (R. at 16).

In sum, in making the step four determination, the ALJ discussed each of Plaintiff's conditions at length, along with the physical and mental limitations that each imposed on Plaintiff's ability to work. (R. at 16-19). Specifically, spanning over three pages, the ALJ weighed and discussed each part of the record, medical and non-medical, regarding each of Plaintiff's impairments. (R. at 16-19). In light of the same, in this Court's estimation, the ALJ's decision at step four is supported by substantial evidence.

E.     **Evaluation of Plaintiff's Subjective Complaints**

Plaintiff next argues that the ALJ erred in discrediting his subjective complaints of pain and other non-exertional limitations by failing to show any rational basis for the same and by citing to factual inaccuracies in the record. (Docket No. 10 at 13-14).   For the following reasons, the Court does not agree.

In making a determination under step four, an ALJ is required to evaluate a claimant's subjective claimants about the intensity, persistence, and limiting effects of the alleged symptoms. *Malloy v. Comm'r of Soc. Sec.*, Civ. A. No. 08-2776, 306 Fed. Appx. 761, 765 (3d Cir. 2009)(not precedential)(citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)); *see also* 20 C.F.R. §§ 404.1529(d)(4), 416.929(d)(4).   Allegations of pain and other subjective symptoms must be supported by objective medical evidence, 20 C.F.R. § 404.1529(c), and an

24

ALJ may reject a claimant's subjective testimony if he does not find it credible based on the medical record and other evidence regarding the true extent of the pain alleged, so long as he explains why he is rejecting the testimony. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999); SSR 96-7p, 1996 SSR LEXIS 4. An ALJ's credibility finding is entitled to deference and should not be disturbed lightly, given his opportunity to observe a claimant's demeanor. *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003).

Here, pursuant to the Regulations, the ALJ found Plaintiff's subjective complaints were only partially credible in light of the medical evidence and Plaintiff's comments about his employment subsequent to his alleged onset date. (R. at 17, 19). Specifically, the ALJ did not find Plaintiff fully credible because his testimony was inconsistent with objective medical evidence regarding his multiple medical conditions, reviewed at length by the ALJ. (R. at 17-19). To this end, the ALJ noted that as of that time, Plaintiff required only conservative medical management for most of his conditions. (R. at 19). In particular, the ALJ recalled that the record showed that Plaintiff did not require the use of an ambulatory device, and there was no indication of significant sensory, motor, or reflex loss. (*Id.* at 17). Nor did Plaintiff require strong narcotic medication for pain control, and there were no signs of clinical atrophy, despite Plaintiff's assertions that he does nothing all day. (*Id.*).

The ALJ further determined that Plaintiff's credibility was "questionable" given that he testified to performing light work picking mushrooms in 2007, and working as a cook in a bar for much of 2008, subsequent to the alleged onset date. (*Id.*). Additionally, the ALJ commented that Plaintiff did not appear at the hearing to have any significant problems communicating or carrying out his normal routine. (*Id.*).  The ALJ further observed that there "is no indication of

25

significant impairment in his thought processes, attention, or concentration," and that Plaintiff "was able to present his case in a reasonable fashion, with no signs of mental confusion or severe depression." (*Id.* at 19). Given this record, the Court finds that the ALJ's credibility finding was thoroughly explained. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999)(an ALJ properly evaluates credibility where he "cite[s] specific instances where [claimant's] complaints about pain and other subjective symptoms [are] inconsistent with" the objective medical evidence of record). Therefore, this finding is supported by substantial evidence.

### F.      Consideration of Dr. Balestrino's and the VE's Opinions

Plaintiff contends that the ALJ improperly disregarded the opinions of his treating doctor, Dr. Balestrino, who found Plaintiff to be "temporarily disabled." (Docket No. 10 at 14; R. at 269). As there were no other medical records that included the same determination, Plaintiff argues that the ALJ erred in failing to give Dr. Balestrino's opinion significant weight. (*Id.* at 14-15). Additionally, the ALJ erred in ignoring the VE's opinion that if an individual would be unable to perform his job for periods throughout the day more than 10 % of the work day on a consistent basis or if he would be absent one and one-half days of work consistently, he would not be able to work. (*Id.* at 15). Because Plaintiff has these limitations, he should be found disabled. (*Id.*).

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d. Cir. 2000)(quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)). However, for controlling weight to be given to the opinion of a treating

physician that opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques and ... not inconsistent with other substantial evidence." 20 C.F.R. §§ 404.1527 (d)(2), 416.972 (d)(2). An ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but also may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. *Newhouse v. Heckler,* 753 F.2d 283, 286 (3d Cir.1985). There are several factors that the ALJ may consider when determining what weight to give the opinion of the treating physician. 20 C.F.R. §404.1527, 416.927 (d)(2). They include the examining relationship, treating relationship (its length, frequency of examination, and its nature and extent), supportability by clinical and laboratory signs, consistency, specialization, and other factors. 20 C.F.R. § 404.1527(d), 416.927 (d).

Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the medical evidence and give some reason for discounting the evidence he rejects. *Stewart v. Secretary of H.E.W.,* 714 F.2d 287, 290 (3d Cir.1983).

In the ALJ's opinion, he gave little weight to Dr. Balestrino's assessment on August 24, 2006 that the claimant was "temporarily disabled" because it was inconsistent with other medical evidence in the record. (R. at 19). This assessment, completed as part of a check-the-box form for the Pennsylvania Department of Public Welfare, was based on Dr. Balestrino's evaluation of a

27

herniated cervical disc and an abnormal MRI. (R. at 269-70). Dr. Balestrino's opinion of "temporarily disabled" was not explained in an accompanying report, as it was rendered on a check-the-box form. (R. at 269). Moreover, this opinion is inconsistent with the results of an MRI completed in June 2006, which showed only a left lateral disc protrusion and minor bulging in the lumbar spine, not a herniated cervical disc. (R. at 315, 468, 478-79). It is also inconsistent with Dr. Balestrino's treatment note, also dated August 24, 2006, that Plaintiff did not have any symptoms of MS at that time and other records reflecting that Plaintiff was neurologically intact. (R. at 473, 482). Although Plaintiff became more symptomatic of MS in 2008, in May of 2008, Dr. Balestrino observed no significant eye symptoms or neurological deficits and reported that Plaintiff's symptoms related to MS and his neurological well-being were controlled with the use of steroid medicine. (R. at 409).

Despite Plaintiff's contention, there is no indication that the ALJ ignored Dr. Balestrino's recommendation. The ALJ opined that Dr. Balestrino's opinion of "temporarily disabled" was not entitled to "much weight" because it was inconsistent with other substantial evidence in the record. (R. at 19). This Court agrees. Furthermore, in this Court's estimation, the ALJ thoroughly considered Dr. Balestrino's opinion in contrast to the other conflicting evidence of record and gave sufficient reasons for discounting that opinion. The Court further notes that a treating physician's opinion on a dispositive issue (a finding of disabled) is reserved to the Commissioner, thus, not entitled to any special significance. 20 C.F.R. § 404.1527(e)(3); *see also Christner v. Astrue*, Civ. A. No. 08-991, 2009 WL 186010, at *6 (W.D. Pa. Jan. 27, 2009)(discussing the same in light of the fact that disability determinations are the province of

the ALJ under 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). Accordingly, the Court finds that the ALJ did not err in his consideration of Dr. Balestrino's opinion.

Regarding Plaintiff's argument that the ALJ disregarded the VE's testimony, the Court is not persuaded that the ALJ erred in this regard. The ALJ was within his authority to reject the VE's testimony because, as previously explained by the ALJ, the record did not support a finding that Plaintiff had the additional limitations advanced by the ALJ to the VE. (R. at 62); *See Podedworny v. Harris*, 745 F.2d 210 (3d Cir. 1984)(a hypothetical question must reflect all of a claimant's impairments supported by the record, otherwise, the question is deficient and the VE's answer is not entitled to substantial weight). Moreover, there is no evidence that ALJ did in fact disregard the VE's testimony. (*See* R. at 62-63, 20). Therefore, the ALJ did not err in this regard.

## VI.    Conclusion

Based on the foregoing, the Court finds that the decision of the ALJ is supported by substantial evidence.  Accordingly, Plaintiff's motion for summary judgment (Docket. No. [9]) is denied; Defendant's motion for summary judgment (Doc. No. [14]) is granted; and, the decision of the ALJ is affirmed. An appropriate Order follows.

BY THE COURT:

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated:  March 30, 2010

cm/ecf:        All counsel of record.

29